IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| JACKIE MANNS,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | CASE NO. 3:25-CV-02645-JJH<br><br>JUDGE JEFFREY J. HELMICK<br><br>MAGISTRATE JUDGE DARRELL A. CLAY<br><br>**REPORT AND RECOMMENDATION** |

## INTRODUCTION

Plaintiff Jackie Manns challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB). (ECF #1) The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter was referred to me under Local Civil Rule 72.2 to prepare a Report and Recommendation. (Non-document entry of Dec. 5, 2025). For the reasons below, I recommend the District Court **AFFIRM** the Commissioner's decision.

## PROCEDURAL BACKGROUND

Mr. Manns applied for DIB on April 25, 2023, alleging disability beginning February 1, 2018. (Tr. 211). After his claim was denied initially and on reconsideration, Mr. Manns requested a hearing before an Administrative Law Judge. (Tr. 90, 101, 108). On November 21, 2024, Mr. Manns (represented by counsel) and a vocational expert (VE) testified before the ALJ. (Tr. 36-66). On March 17, 2025, the ALJ determined Mr. Manns was not disabled. (Tr. 17-29). On October 10, 2025, the Appeals Council denied Mr. Manns' request for review of the ALJ's decision,

making the ALJ's decision the final decision of the Commissioner. (Tr. 1-3; *see also* 20 C.F.R. § 404.981). Mr. Manns timely filed this action. (ECF #1).

## Factual Background

### I. Personal and Vocational Evidence

Mr. Manns was 40 years old on the alleged onset date and 47 years old at the administrative hearing. (*See* Tr. 68, 40). His date last insured was June 30, 2023. (Tr. 20). He has a high school diploma and has past relevant work experience as an overhead crane operator. (*See* Tr. 251, 60).

### II. Relevant Medical Evidence

Mr. Manns has a history of interrelated obesity and knee problems. In April 2018, Mr. Manns sought treatment through his primary-care provider for obesity and knee pain. (Tr. 340). He reported pain and limited range of motion with his left knee "for years" despite gel and steroid injections and arthroscopic surgery. (Tr. 341). A physical examination also found swelling and tenderness in the left knee. (Tr. 343). He had an orthopedic surgical consultation and was told he must lose weight before any other options were available. (*Id.*). At the time, he weighed 364 pounds with a body-mass index (BMI) of 49. (Tr. 341-42). He "never tried to lose weight in the past" and his knee caused difficulty with aerobic exercise. (Tr. 341). He was diagnosed with class 3 obesity (a BMI of 45 to 49.9) and arthralgia in the knees. (Tr. 341-42). He was prescribed ibuprofen for his knee pain and Adipex-P as an appetite suppressant and advised to modify his diet. (Tr. 341).

Mr. Manns followed up as instructed in June 2018. (Tr. 345). He was noted to have "serious degenerative arthritis in his knee." (*Id.*). He reported a 3% drop in weight after the first

month taking Adipex. (*Id.*). Though by July, his weight loss slowed as his course of Adipex ended. (Tr. 349). His prescription for Adipex was stopped in August. (Tr. 353).

In December 2018, Mr. Manns returned to his primary-care provider complaining of worsening knee, hip, and shoulder pain. (Tr. 356, 359). His provider noted that previous x-rays were consistent with medial compartment degenerative disease. (Tr. 356). A physical examination was positive for arthralgia or myalgia. (Tr. 359). He was prescribed Neurontin and his provider referred him for a second opinion about possible knee surgery. (Tr. 357, 360). His myalgias continued and required some medication adjustment in March and June 2020. (*See* Tr. 364, 367).

In September 2021, Mr. Manns consulted with an orthopedic surgeon for an evaluation of his progressively worsening knee pain to the point he could walk only short distances. (Tr. 506). He reported owning a landscaping business at the time. (Tr. 507). A physical examination noted an antalgic gait; no tenderness in his hips; and slight-to-mild tenderness in his knees, full range of motion in his hips, and limited range of motion in his left knee with mild pain. (Tr. 507-08). His knees were stable, had full muscle strength, and intact sensation. (Tr. 508). He was assessed with end-stage arthritis of the left knee, moderate arthritis of the right knee, and given an injection in the left knee. (*Id.*). He also was assessed with obesity with a BMI of 56 and a weight of 405 pounds. (*Id.*). He received a corticosteroid injection. (Tr. 509).

In October, Mr. Manns returned with severe pain in his right knee. (Tr. 392). He was re-prescribed a low dose of tramadol after it had "provided significant relief" to pain in September (*Id.*). At another visit in October, Mr. Manns explained that he was "working in the yard" when he twisted and felt a pop" in his right knee a few months prior. (Tr. 504-05). He also reported injections and gel in his left knee had not worked and that he would need a knee replacement. (Tr.

503). Pending the results of an MRI, he was diagnosed with a right knee medial meniscus tear. (Tr. 505; *see also* Tr. 854-55).

Mr. Manns followed up in November after the MRI and his diagnoses were confirmed. (Tr. 498). He was given a cortisone injection and later a diagnostic nerve-block injection to his left knee and expected similar injections in his right knee. (Tr. 496-98, 494-95). He was not a candidate for surgical repair of his meniscus tear or to replace his knee. (Tr. 498).

In January 2022, Mr. Manns reported minimal improvement from the nerve block injection and previous prescriptions for pain medications like tramadol. (Tr. 490). He was prescribed Percocet, an opioid, for pain management. (Tr. 493). He returned every two months for regular pain management and his reported pain levels ranged from 5/10 to 8/10. (Tr. 485, 480, 475, 471, 465, 459, 454, 665, 660) (ordered chronologically). By January 2023, he reported Percocet provided 50% relief. (Tr. 460). By May, he reported Percocet was no longer as effective as before and he was prescribed Norco, a different opioid, on a trial basis. (Tr. 666, 670). In July, just after the June 30, 2023 date last insured, he had resumed taking Percocet "with functional relief" and his pain had "improved some" with a home-exercise program. (Tr. 661, 665).

In March 2022, Mr. Manns established care with Lawrence Kuk, D.O., after his prior primary care provider stopped taking his insurance. (Tr. 939). There, he reported planning to see a bariatric surgeon in the near future. (*Id.*). His medications for fibromyalgia were continued. (Tr. 940). In September 2022, Mr. Manns reported wanting to switch fibromyalgia medications, but Dr. Kuk could not prescribe other medications himself; rather Mr. Manns would need the approval of his pain management provider, which he later obtained. (Tr. 925-26; *see also* Tr. 471, 467 (noting switch from Cymbalta to Lyrica)). In March 2023, he returned to Dr. Kuk and

reported developing muscle weakness and stiffness and was referred for a neurological evaluation. (Tr. 923-24). In May 2023, Dr. Kuk referred Mr. Manns to a cardiologist to evaluate his complaints of dyspnea (shortness of breath) out of proportion to his exertion without chest pain or heart burn. (Tr. 921). In April 2024, after the date last insured, Mr. Manns returned for his annual checkup and reported being scheduled for bariatric surgery in the next few months. (Tr. 916).

## III. Relevant Opinion Evidence

On initial review on August 25, 2023, state agency medical consultant Steve McKee, M.D., reviewed Mr. Manns' file and concluded there was insufficient evidence to assess his cardiology treatment, shortness of breath, and other conditions. (*See* Tr. 70-73).

On May 30, 2024, Dr. Kuk completed a physical treating medical source statement about Mr. Manns' conditions. (Tr. 886-90). Dr. Kuk noted Mr. Manns' prognosis was guarded. (Tr. 886). Dr. Kuk opined Mr. Manns' chronic pain and muscle stiffness from fibromyalgia and arthritis in multiple sites frequently interfered with the attention and concentration needed to perform even simple work tasks and Mr. Manns was incapable of even low stress jobs. (Tr. 887). Dr. Kuk also opined Mr. Manns could walk zero city blocks without rest or severe pain; sit for 45 minutes at a time and less than two hours total; stand for 20 minutes at a time and less than two hours total; lift and carry 10 pounds occasionally, 20 pounds rarely, and never 50 pounds; frequently hold his head still, occasionally look up or turn his head right or left and rarely look down; rarely twist, stoop, crouch/squat, and climb stairs; never climb ladders; and use his hands and fingers 10% of the time and his arms 5% of the time. (Tr. 887-89). Dr. Kuk further opined Mr. Manns needed to be free to shift from sitting, standing, or walking at will; take unscheduled breaks as needed; and use a cane or other assistive device. (Tr. 888). Dr. Kuk opined that Mr. Manns does not need walking breaks during the day but also checked the box indicating that every five minutes, Mr.

Manns must walk for five minutes (*see id.*). Last, Dr. Kuk opined Mr. Manns would have good and bad days and he was likely to be absent from work more than four days a month. (Tr. 889).

On reconsideration review on November 30, 2024, state agency medical consultant Jose Ruiz, M.D., reviewed updated medical records and opined Mr. Manns can lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for four hours in an eight-hour workday; sit for about six hours in an eight-hour workday; occasionally climb ramps and stairs; never climb ladders, ropes, and scaffolds; frequently balance and stoop; never kneel and crawl; occasionally crouch; frequently reach overhead with his right arm; and must avoid concentrated exposure to extreme cold and vibration and all exposure to workplace hazards like machinery and unprotected heights. (Tr. 77-79).

## IV. Testimonial Evidence

Mr. Manns explained his pain began with his left knee starting to ache and then worsened over time to the point he could not sleep. (Tr. 43-44). At that point, he went to a doctor and was diagnosed with a tear in the meniscus and arthritis. (Tr. 44). He takes pain medication, but it only reduces his pain to about a 6 or 7 out of 10. (Tr. 45). He also underwent injections for his knees that helped at first but lost effectiveness. (Tr. 52). After that, he had a gel treatment that also worked for a few months, but it too lost effectiveness over time. (Tr. 53). He also has diagnoses for fibromyalgia and chronic pain that cause swelling in his leg as well as stiffness, aches, pains, and burning in his shoulders and hands. (Tr. 50).

Mr. Manns pursued bariatric treatment to help lose weight. (Tr. 52). His weight fluctuated in the past month from 439 pounds to 458 pounds and precludes his eligibility for knee-replacement surgery. (Tr. 52). He has consulted with a dietician and attended nutrition classes to change his diet. (Tr. 52). He is scheduled to undergo gastric-bypass surgery the month after the

hearing. (Tr. 52). Associated with his weight gain, he developed abscesses under his armpit that make it painful to lift his arms. (Tr. 56). He also has sleep apnea and recently got a CPAP machine to help sleep. (Tr. 54).

Mr. Manns had been working as a crane operator but in 2018 he was laid off after the company downsized. (Tr. 44). He tried applying to other jobs but could not find a position that met his doctor's restrictions, including never climbing ladders and limited walking. (*See* Tr. 44-45). He also applied to different types of jobs in the logistics industry that he could do, such as a truck dispatcher, but was unsuccessful in finding entry-level positions. (Tr. 59).

Mr. Manns lives with his wife and two teenage children. (Tr. 40). He takes care of the house, but it takes him all day. (Tr. 49). He does some housework but will have to return to his chair to take a break and then return to finish the task. (Tr. 48). When he sits, he keeps his legs raised in a recliner to reduce pain and swelling. (Tr. 46). He cannot stand long enough to wash dishes and must use a stool. (Tr. 47). Walking is even worse for him. (Tr. 47-48). He has a wheeled office chair he can use to sweep the floor. (Tr. 49). He cannot climb the stairs in his house. (Tr. 45). He gets tired during the day and dozes off at least once or twice a day when watching TV or folding clothes while sitting. (Tr. 55).

Mr. Manns has both good days and bad days. (Tr. 49). On good days, he is "not walking around like I'm 80 years old" and he can get more things done. (Tr. 49-50). On bad days, he is stiff and achy and can do very little. (Tr. 49-50).

## Standard for Disability

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 1382c(a)(3)(A); *see also* 20 C.F.R. § 404.1505(a).

The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine whether a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, which is "severe," defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his or her residual functional capacity, age, education, and work experience?

Under this sequential analysis, the claimant has the burden of proof through Step Four. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to prove whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine whether the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is the claimant deemed disabled. 20 C.F.R. § 404.1520(c)-(f); *see also Walters*, 127 F.3d at 529.

## THE ALJ'S DECISION

At Step One, the ALJ determined Mr. Manns' date last insured against disability was June 30, 2023 and he had not engaged in substantial gainful activity from the alleged onset date though

the date last insured. (Tr. 20). At Step Two, the ALJ identified morbid obesity, bilateral knee osteoarthritis, right knee meniscus tear, right rotator cuff syndrome, obstructive sleep apnea, chronic pain syndrome/fibromyalgia, and hypertension as severe impairments. (*Id.*). At Step Three, the ALJ found Mr. Manns' impairments did not meet or medically equal the requirements of a listed impairment. (Tr. 20-21). At Step Four, the ALJ determined Mr. Manns' RFC as follows:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except the claimant must avoid climbing ladders, ropes, or scaffolds; must avoid kneeling and crawling; can occasionally crouch; can occasionally climb ramps or stairs; can frequently balance or stoop; must avoid hazards such as machinery, heavy machinery, or unprotected heights; can frequently reach overhead with the right upper extremity; must avoid concentrated exposure to extreme cold and vibrations; would benefit from sit/stand as needed at the work station while remaining on task; and would be off task up to five percent of the workday.

(Tr. 21) (cleaned up). The ALJ then found Mr. Manns could not perform his past relevant work as an overhead crane operator through his date last insured. (Tr. 27). At Step Five, the ALJ found Mr. Manns could have performed other work through his date last insured, including as a telephone quotation clerk, ticket checker, call operator, and document preparer. (Tr. 28). Thus, the ALJ concluded Mr. Manns was not disabled. (Tr. 29).

## Standard of Review

In reviewing the denial of Social Security benefits, the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters,* 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence" is "more than a scintilla of

evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). But "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Apart from considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. *Walters,* 127 F.3d at 528. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not follow its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

## Discussion

Mr. Manns argues the ALJ misevaluated Dr. Kuk's opinion and improperly relied on the ALJ's own lay opinion of medical evidence. (ECF #9 at PageID 1156). I address each argument individually.

### I. Analysis of Dr. Kuk's opinion

Mr. Manns first argues the ALJ mis-evaluated Dr. Kuk's opinion because it was unclear how the daily activities the ALJ cited were inconsistent with the opinion and the ALJ referred to treatment notes that did not support the opinion only in the most general terms, frustrating meaningful judicial review. (ECF #9 at PageID 1163, 1165-66). The Commissioner responds those findings apply the consistency and supportability factors and substantial evidence supports those findings. (ECF #10 at PageID 1175-78).

In assessing the claimant's RFC, the ALJ must review all medical opinions and prior administrative findings and *explain* how persuasive he finds them. *See* 20 C.F.R. § 404.1520c(b); *see also Reeves v. Comm'r of Soc. Sec.*, 618 F.App'x 267, 275 (6th Cir. 2015). The ALJ considers five factors to determine persuasiveness: (1) supportability; (2) consistency; (3) the source's relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship; (4) the source's specialization; and

(5) any other factors that tend to support or contradict a medical opinion. 20 C.F.R §§ 404.1520c(c)(1)-(5). The regulations require the ALJ to "explain how [the ALJ] considered the supportability and consistency factors for a medical source's medical opinion," as they are the two most important factors. *See id.* § 404.1520c(b)(2). The ALJ's supportability analysis should address the evidence and justifications the medical professional cites in support of the ALJ's own conclusions. *See Crystal E.J. v. Comm'r of Soc. Sec.*, No. 2:21-cv-4861, 2022 WL 2680069, at *7 (S.D. Ohio Jul. 12, 2022), *report and recommendation adopted*, 2022 WL 2974734 (S.D. Ohio Jul. 27, 2022). The consistency analysis compares the medical opinion at issue with evidence from other sources. *Ford v. Comm'r of Soc. Sec.*, No. 1:22-cv-524, 2023 WL 2088157, at *17 (N.D. Ohio Jan. 31, 2023), *report and recommendation adopted*, 2023 WL 2080159 (N.D. Ohio Feb. 17, 2023). The ALJ's explanation should "generally include[ ] an assessment of the supporting objective medical evidence and other medical evidence, and how consistent the medical opinion or prior administrative medical finding is with other evidence in the claim." *Id.* The reasons for the ALJ's conclusions must be stated in a manner that allows the reviewing court to "trace the path of the ALJ's reasoning" from evidence to conclusion. *Stacey v. Comm'r of Soc. Sec.*, 451 F.App'x 517, 519 (6th Cir. 2011). If the ALJ discusses both consistency and supportability, and substantial evidence supports the discussion, then the reviewing court may not disturb the ALJ's findings. *Paradinovich v. Comm'r of Soc. Sec.*, No. 1:20-cv-1888, 2021 WL 5994043, at *7 (N.D. Ohio Sept. 28, 2021), *report and recommendation adopted*, 2021 WL 5119354 (N.D. Ohio Nov. 4, 2021).

The ALJ analyzed Dr. Kuk's opinion as follows:

> The claimant's provider since March 2022 offered opinions that were not persuasive. Among other extreme limitations, the provider said that the claimant could sit for less than two hours in an eight-hour workday and stand or walk for less than two hours in an eight-hour workday; thus, the provider opined that the claimant would

> have to be in a position other than sitting, standing, or walking for half of a workday. Also, he said the claimant required a cane or assistive device for occasional standing or walking. These opinions are not consistent with the claimant's activities, including doing his job until he was laid off, just prior to his alleged disability onset date and his ability to do some house and yard work. As shown *supra*, the provider's own notes do not support his extreme opinions and they are not consistent with the record as a whole. Neither the provider nor any other prescribed a cane or assistive device.

(Tr. 27) (citations omitted).

Beginning with the supportability factor, the ALJ criticized the opinion that "the claimant could sit for less than two hours and stand or walk for less than two hours in an eight-hour workday" as implying "the claimant would have to be in a position other than sitting, standing, or walking for half of a workday" and found "the provider's own notes do not support his extreme opinions." (Tr. 27). Discussing both the medical professional's explanation of the conclusions and the evidence the professional cited in support go to the heart of supportability. *See Crystal E.J.*, 2022 WL 2680069, at *7.

Substantial evidence supports the ALJ's finding that Dr. Kuk's explanations undercut the persuasiveness of the opinion. Dr. Kuk opined that Mr. Manns can sit and stand/walk each for less than two hours over an eight-hour workday. (Tr. 888). This means Mr. Manns would spend more than four hours of an eight-hour workday unable to sit, stand, or walk. This seemingly means Mr. Manns would be lying down resting. But that inference is at odds with Dr. Kuk's apparent

opinion that every five minutes, Mr. Manns must walk for five minutes. (*See id.*).[1] Setting aside that Dr. Kuk opined Mr. Manns both does and does not need walking periods (*see id.*), walking for five minutes every five minutes means Mr. Manns must walk four hours in total over an eight-hour workday, more than double his maximum walking of less than two hours of walking a day. Thus, substantial evidence supports the ALJ finding Dr. Kuk's opinion not fully supported by its own explanation.

Substantial evidence also supports the ALJ's finding that Dr. Kuk's treatment notes do not support the limitations to which he opined. Mr. Manns agrees Dr. Kuk's treatment notes "do not contain detailed physical examinations that help to support this opinion." (ECF #9 at PageID 1165). Indeed, Dr. Kuk's treatment notes had one detailed examination with generally normal findings outside of obesity (Tr. 939-40); otherwise, the notes indicated he was in good health (Tr. 925, 923, 921, 919, 916). The greatest findings in support Dr. Kuk noted were Mr. Manns' reports of muscle weakness and stiffness (Tr. 923-24) and shortness of breath disproportionate to his exertion (Tr. 921). But even those findings do not show how Dr. Kuk arrived at the detailed limitations on Mr. Manns' ability to walk, lift and carry weight, move his head, bend, twist, crouch, climb or use his hands and fingers. (*See* Tr. 887-89). Mr. Manns argues Dr. Kuk's opinion is

---

1 Dr. Kuk's medical source statement indicated:

e. Does your patient need to include periods of walking around during an 8-hour working day? __ Yes X No

1) If yes, approximately how *often* must your patient walk?
1 (5) 10 15 20 30 45 60 90
Minutes

2) How *long* must your patient walk each time?
1 2 3 4 (5) 6 7 8 9 10 11 12 13 14 15
Minutes

(Tr. 888).

nonetheless consistent with other records. (ECF #9 at PageID 1165) (citing Tr. 455-502, 508-09, 521, 613-14, 665-70). But comparing the opinion to evidence from others goes to the consistency factor, not supportability. *See Ford*, 2023 WL 2088157, at *17.

Turning to the consistency factor, the ALJ identified Dr. Kuk's opinion as inconsistent "with the claimant's activities, including doing his job until he was laid off, just prior to his alleged disability onset date and his ability to do some house and yard work" as well as "[a]s shown *supra* . . . with the record as a whole." (Tr. 27).

First, Mr. Manns argues it is unclear how the ALJ considered his working until being laid off in assessing Dr. Kuk's opinion. It is not immediately clear based solely on the one paragraph how the ALJ thought Mr. Manns' working until he became disabled is inconsistent with Dr. Kuk's opinion. However, a reviewing court reads the ALJ's decision as a whole. *See Buckhannon ex rel. J.H. v. Astrue*, 368 F.App'x 674, 678-79 (7th Cir. 2010). The ALJ explained the thinking on the previous page:

> The claimant has a long history of morbid obesity and significant musculoskeletal issues; however, they did not stop him from earning substantial gainful activity at a job that required him to climb a 40-foot ladder at least twice daily. While his impairments were degenerative in nature and the record shows worsening, the claimant lost his job because he was let go because the position was eliminated; he did not stop working due to his impairments.

(Tr. 26). That Mr. Manns was able to work and climb a ladder twice a day despite his impairments in 2018 and that he did not leave his job due to his impairments but instead applied, albeit unsuccessfully, for other work both suggest Mr. Manns did not believe himself incapable of any substantial gainful activity at that time.

The ALJ also noted in "[i]n April 2021, the claimant said he had right flank pain after lifting and moving boxes." (Tr. 23) (citing Tr. 383-84). The ALJ further noted that in October

2021, "the claimant reported that he was 'working in the yard' when he injured his right knee a few months prior. The claimant 'twisted and felt a pop.'" (Tr. 24) (citing Tr. 504-05, 854-55). While these activities predate Mr. Manns' establishing care with Dr. Kuk in March 2022 (*see* Tr. 890, 939), that the ALJ thought Dr. Kuk's treatment notes (and other treatment notes) did not show a serious deterioration in Mr. Manns' condition reveals the ALJ thought Mr. Manns' activities in 2021 remained representative of his functional status. Mr. Manns points to his own testimony that his most recent daily activities involve "very minimal housework which required him to take breaks and sit in a rolling chair in order to complete." (ECF #9 at PageID 1165) (citing Tr. 48-49). While the ALJ could have found Mr. Manns' testimony about his recent activities to be more representative of his functioning than his activities in 2021, the ALJ was not obligated to do so, particularly as Mr. Manns' testimony would describe his functioning in November 2024, after his date last insured of June 30, 2023. *Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 849-50 (6th Cir. 2020) (describing rule that evidence from after a claimant's date last insured is useful only to the extent it illuminates the claimant's condition before the expiration of disability insurance). And a reviewing court is not permitted to decide for itself whether evidence from 2021 or 2024 best illuminates Mr. Manns' activities from his 2018 alleged onset date to his 2023 date last insured. *See Brainard*, 889 F.2d at 681 (holding reviewing courts do not re-weigh the evidence de novo). Thus, Mr. Manns has not shown the ALJ erred in evaluating his daily activities.

Second, the ALJ found Dr. Kuk's opinion was inconsistent "[a]s shown *supra* . . . with the record as a whole." (Tr. 27). Mr. Manns argues this was improper because the "ALJ failed to cite to any records in rejecting this opinion, merely vaguely referring to the record as a whole, which frustrates meaningful review." (ECF #9 at PageID 1165). While it may be preferrable for the ALJ

to explain every conclusion in detail with appropriate citations to the record, "there is no requirement that the ALJ incorporate all the information upon which he relied into a single tidy paragraph." *Evans v. Comm'r of Soc. Sec.*, No. 1:19-cv-2895, 2020 WL 6064112, at *13 (N.D. Ohio Oct. 14, 2020) (citing *Buckhannon*, 680 F.3d at 1067).

Mr. Manns argues Dr. Kuk's opinion is nonetheless consistent with other records. (ECF #9 at PageID 1165) (citing Tr. 455-502, 508-09, 521, 613-14, 665-70). The medical records do show that Mr. Manns had end-stage arthritis in the left knee and moderate arthritis in the right knee that caused progressively worsening knee pain. (*See, e.g.*, Tr. 506-08). And those conditions persisted despite injections, gel, nerve blocks, and opioid pain management and that he would need knee surgery, but he was not a candidate for surgery due to his weight. (*See* Tr. 503, 496-98, 494-95, 485, 480, 475, 471, 465, 459, 454, 665, 660). However, the ALJ noted that the pain-management records also detailed that medication allowed Mr. Manns to "work and function through the day" or gave him "functional relief." (*See* Tr. 26) (citing Tr. 455, 460, 466, 471, 476, 661, 745, 910). These records provide substantial evidence supporting the ALJ's conclusion that Mr. Manns is not as limited as Dr. Kuk opined.

I thus decline to recommend remand on this basis.

## II. RFC's requirement that Mr. Manns needs a sit/stand option and would be off task for 5% of the time

Mr. Manns argues the ALJ improperly relied on her own lay opinion of medical evidence to devise "the highly specific sit/stand and off task limitations" in the RFC. (ECF #9 at PageID 1166). He cites a number of cases from other district courts in this circuit concluding the RFC must be supported by a medical opinion. (*Id.* at PageID 1166-67). Mr. Manns also argues the ALJ did not build an accurate and logical bridge from the evidence to the specific sit/stand and off-task

limitations. (*Id.* at PageID 1167). The Commissioner responds that the ALJ relied in part on the prior administrative medical findings in crafting an RFC that was even more limited than that medical opinion suggested. (ECF #10 at PageID 1179-80).

Beginning with Mr. Manns' argument that the RFC *must* be supported by a medical opinion, the Sixth Circuit has "previously rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ." *Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F.App'x 395, 401 (6th Cir. 2018); *see also Rudd v. Comm'r of Soc. Sec.*, 531 F.App'x 719, 728 (6th Cir. 2013); *Shepard v. Comm'r of Soc. Sec.*, 705 F.App'x 435, 442-43 (6th Cir. 2017). The Sixth Circuit has also observed: "No bright-line rule exists in our circuit directing that medical opinions must be the building blocks of the residual functional capacity finding, but the administrative law judge must make a connection between the evidence relied on and the conclusion reached." *Tucker v. Comm'r of Soc. Sec.*, 775 F.App'x 220, 226 (6th Cir. 2019). However, even were Mr. Manns' legal argument persuasive, the ALJ did base the RFC in part on a medical opinion: the prior administrative medical findings on reconsideration review. (*See* Tr. 26). And the ALJ was not bound to adopt solely the limitations in that opinion. *See Reeves v. Comm'r of Soc. Sec.*, 618 F.App'x 267, 275 (6th Cir. 2015).

An ALJ must temper the duty to evaluate the medical and other evidence with the temptation to "play doctor" by substituting the ALJ's own medical judgment for that of medical professionals. *See Furlong v. Comm'r of Soc. Sec.*, No. 1:22-cv-588, 2023 WL 2987821, at *9 (N.D. Ohio Feb. 17, 2023), *report and recommendation adopted,* 2023 WL 4931930 (N.D. Ohio Aug. 2, 2023). An ALJ impermissibly "plays doctor" where he substitutes his knowledge for that of a

physician or medical expert and interprets raw medical data. *See Rudd,* 531 F.App'x at 726. Raw medical data generally includes things like imaging studies, not treatment notes or reports by medical professionals. *See Snyder v. Comm'r of Soc. Sec.*, No. 3:25-cv-1219, 2026 WL 364319, at *9 (N.D. Ohio Feb. 10, 2026) (collecting cases), *report and recommendation adopted,* 2026 WL 1505992 (N.D. Ohio May 29, 2026). As such, "an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a [RFC]." *Poe v. Comm'r of Soc. Sec.*, 342 F.App'x 149, 157 (6th Cir. 2009).

Mr. Manns has not identified any raw medical data that the ALJ interpreted. Rather, he appears to presume that because the ALJ rejected Dr. Kuk's opinion (which discusses sit/stand requirements and off-task time) and the state agency opinion does not address either (*contrast* Tr. 888-89 *with* Tr. 77-79), then the ALJ necessarily interpreted raw medical data to craft an RFC with limitations in those areas. But there is no reason to presume that as "an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a [RFC]." *Poe*, 342 F.App'x at 157. There were various imaging studies of Mr. Manns' knee (the archetypical raw medical data) that the ALJ did not interpret but rather mentioned in the context of doctors' interpretations. (*See* Tr. 23) ("[T]he claimant's primary care provider noted . . . x-rays showed medial compartment degenerative disease."). Moreover, presuming that the ALJ *must* have interpreted raw medical data to impose a limitation beyond what the persuasive prior administrative medical findings contained cuts against the general reluctance by district courts in this circuit against faulting an ALJ "for finding more restrictions than the state agency reviewers opined." *Laney v. Comm'r of Soc. Sec.*, No. 5:21-cv-1290, 2022 WL 2176539, at *7 (N.D. Ohio June 16, 2022); *see also Trista L. v. Comm'r of Soc. Sec.*, No. 2:25-cv-1184, 2026 WL 1133321,

at *4 (S.D. Ohio Apr. 27, 2026); *Mosed v. Comm'r of Soc. Sec.*, No. 2:14-cv-14357, 2016 WL 6211288, at *7 (E.D. Mich. Jan. 22, 2016), *report and recommendation adopted*, 2016 WL 1084679 (E.D. Mich. Mar. 21, 2016). Thus, Mr. Manns' argument that the ALJ necessarily played doctor to reach the sit/stand and off-task time limitations is unpersuasive.

Last, Mr. Manns argues the ALJ did not build an accurate and logical bridge from the evidence to the conclusion that he needs a sit/stand option and will be off task 5% of the time. It is true that the ALJ did not explain the basis for these limitations in the decision. (*See* Tr. 21-27). Mr. Manns points out the VE opined if he were off task for 15% of the time, he would be unable to secure competitive employment. (ECF #9 at PageID 1168) (citing Tr. 63-64). But the ALJ is not required to explain why a specific percentage of time off task was chosen over all other possible percentages. *See Gaines v. Bisignano*, No. 3:25-cv-1859, 2026 WL 1642890, at *10 (N.D. Ohio June 8, 2026), *report and recommendation adopted,* 2026 WL 1805501 (N.D. Ohio June 23, 2026).

Additionally, Mr. Manns does not identify any evidence to support a greater limitation that the ALJ overlooked. *See Shrader*, 2012 WL 5383120, at *6 ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."). My own review of the record does not uncover any unanalyzed evidence for off-task time or a sit/stand option. The prior administrative medical findings made no mention of either. (*See* Tr. 77-79). Dr. Kuk opined Mr. Manns would need unscheduled breaks as needed. (Tr. 888). But the ALJ explained why Dr. Kuk's opinion was unpersuasive. (Tr. 27). Mr. Manns testified to needing to take breaks while doing housework and dozing off at least once or twice a day even while in the middle of something. (Tr. 48, 55). But the ALJ analyzed Mr. Manns statements and found them inconsistent with his other daily activities and treatment. (*See* Tr. 26). Presumably, the ALJ would not find this evidence to be

of a greater weight solely for explaining how long off task Mr. Manns would be. Thus, the ALJ already rejected on other grounds the possible evidentiary bases for greater limitations.

I thus decline to recommend remand on this basis.

## Conclusion and Recommendation

After reviewing the record, the parties' arguments, and the law, I recommend the District Court **AFFIRM** the Commissioner's decision denying disability insurance benefits.

Dated: November 12, 2026

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

## Objections, Review, and Appeal

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.**

**Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health & Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-cv-186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).**